IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| LESLIE D. MOWER,<br><br>                  Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>                  Respondent. | **MEMORANDUM OPINION AND ORDER DENYING § 2255 PETITION**<br><br>Civil Case No. 2:08-CV-00005-TC<br><br>Criminal Case No. 2:02-CR-00787-TC-SA |

On March 18, 2005, Petitioner Leslie Mower was convicted by a jury of one count of conspiracy (18 U.S.C. § 371) and six counts of tax evasion (26 U.S.C. § 7201). On September 13, 2006, the court sentenced Ms. Mower to 27 months of incarceration, followed by 36 months of supervised release. The court also imposed a $60,000 fine. Ms. Mower appealed her conviction to the Tenth Circuit Court of Appeals. On March 12, 2008, the Tenth Circuit affirmed her conviction. See United States v. Thompson, 518 F.3d 832 (10th Cir. 2008).[1]

Ms. Mower has now filed this motion under 28 U.S.C. § 2255.[2] She claims that she received ineffective assistance of counsel before trial, during trial, and at the sentencing hearing.

---

[1] Because the Tenth Circuit gave a thorough discussion of the facts in its opinion, the court will not repeat them here except to explain its order.

[2] In December 2007, Ms. Mower filed an "Expedited Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255." (2:08-CV-00005-TC, Dkt. # 1.) Then, in February 2008, Ms. Mower filed a "Supplemental Brief in Support of Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255." (2:08-CV-00005-TC, Dkt. # 15.)

In an earlier order, the court found that Ms. Mower had failed to establish that she received ineffective assistance of counsel at the sentencing hearing. (2:08-CV-00005, Dkt. # 26.)

On June 13, 2008, the court held an evidentiary hearing on Ms. Mower's remaining claims. Ms. Mower's two trial attorneys, Neil Kaplan and Anneli Smith, testified. Ms. Mower also testified. The court has determined, based on the evidence at the hearing, review of relevant parts of the trial transcript and exhibits, and the applicable law that Ms. Mower has failed to establish any of her claims of ineffective assistance of counsel. In fact, although Ms. Mower was convicted, a result with which she is understandably unhappy, it is strikingly clear to the court that Ms. Mower's trial attorneys provided her a thorough, energetic and highly skilled defense.

**ANALYSIS**

"To establish ineffective assistance of counsel, a defendant must show both that his counsel's performance was constitutionally deficient, and that this deficient performance prejudiced him." United States v. Harfst, 168 F.3d 398, 402 (10th Cir. 1999) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). "An ineffective assistance claim may be resolved on either performance or prejudice grounds alone." United States v. Kennedy, 225 F.3d 1187, 1197 (10th Cir. 2000) (citing Fox v. Ward, 200 F.3d 1286, 1295 (10th Cir. 2000)).

To satisfy the first prong of this test, a defendant must show that his "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. For the second prong a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

A court's review of counsel's performance must be highly deferential. "There is a strong

presumption that counsel provided effective assistance, and a section 2255 defendant has the burden of proof to overcome that presumption." Kennedy, 225 F.3d at 1197 (quoting United States v. Williams, 948 F. Supp. 956, 960 (D. Kan. 1996)). It is well-established that actions or omissions that "might be considered sound trial strategy" do not constitute ineffective assistance of counsel. Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

Ms. Mower's remaining claims of ineffective assistance of counsel claims are:

1) Counsel failed to call an expert witness to testify;

2) Counsel failed to call any witnesses to testify on Ms. Mower's behalf;

3) Counsel failed to properly instruct the jury[3];

4) Counsel failed to present settlement offers to Ms. Mower; and

5) Counsel refused to let Ms. Mower testify.

**INEFFECTIVE ASSISTANCE**

1. PERFORMANCE

Expert testimony

Ms. Mower argues that her attorneys were ineffective because they failed to present expert testimony that the signatures on her 1993 and 1994 personal tax returns[4] were not Ms. Mower's but were forged. Although the government did not have to prove that Ms. Mower

---

[3]This argument is easily disposed of because Ms. Mower unsuccessfully raised it on appeal. United States v.Thompson, 518 F.3d 832, 864-66 (10th Cir. 2008). The law is well-settled that, absent an intervening change in the law, issues raised on appeal cannot be raised in a § 2255 motion. United States v. Prichard, 875 F.2d 789, 791 (10th Cir. 1989).

[4]To the extent that Ms. Mower might now have expanded the scope of her claim to include the signatures on all of the tax returns at issue in her trial, the court's analysis and conclusion is the same.

actually signed the returns, signing false tax returns would be evidence that Ms. Mower committed an affirmative act of tax evasion.

Defense counsel hired a forensic document examiner, David Oleksow, to examine the signatures on the 1993 and 1994 returns. He concluded, after comparing Ms. Mower's known signature to those on the returns, that "[t]he questioned signatures . . . show a strong indication of being written by someone other than . . . Leslie Mower . . . . Auto forgery[5] cannot be ruled out." (Hr'g Ex. 6 at 15.)

Defense counsel did not call Mr. Oleksow at trial. Mr. Kaplan explained the reason he and Ms. Smith decided not to call Mr.Oleksow: A government witness, Annette Jenkins, testified at the trial (contrary to her grand jury testimony) that the signature on Ms. Mower's 1994 tax return did not appear to be Ms. Mower's. Moreover, during an interview with a Special Agent for the IRS, Ted Elder, Ms. Mower had admitted that the signature on the tax return was hers. Apparently, the government would not be able to introduce that evidence unless Ms. Mower or another witness, such as a handwriting expert, testified that the signature was not Ms. Mower's. Mr. Kaplan explained:

> We were concerned that that [the handwriting expert's anticipated testimony] was wishy-washy testimony, which [we] were prepared to use if we had nothing else to fall back on. But when Annette Jenkins said it wasn't Mrs. Mower's signature, and the government could not introduce Agent Elder's interview where Mrs. Mower said it was, we thought we had a good record that she had not signed the 1994 return and [we] did not want to muddy the record.

(Hr'g Tr. 27.)

Ms. Mower also argues, as somewhat of a side issue, that a handwriting expert was

---

[5]"Auto forgery" occurs when a person signs his or her signature but tries to make the signature look forged. (Hr'g Tr. 27, June 13, 2008.)

necessary to show that she did not sign certain checks deposited in an account called "Resultz." But whether Ms. Mower did or did not sign some of the checks that were deposited into that account was not significant. As the government points out:

> The Resultz checks were but four of hundreds of US, Australian and Malaysian commission checks which Ms. Mower endorsed and deposited into various bank accounts. The disposition of these checks into her personal checking and savings accounts, as well as other bank accounts, and the failure of Ms. Mower to report the receipt of these checks as income on any tax return, corporate or otherwise, is the evidence which linked her to the conspiracy and tax evasion charges.

(Gov't Resp. 5, 2:08-CV-00005, Dkt # 43.)

Moreover, the main question was not who signed the checks but who actually controlled the Resultz account. Mr. Kaplan explained, "There was an issue . . . over who controlled the Resultz account, whether it was Mrs. Mower or Mr. Mower . . . . And the testimony at the trial was that Mr. Mower controlled it completely. His personal assistant, Patricia Anderson, testified that he received those checks. He deposited them or she deposited for him." (Hr'g Tr. 43-44.)

Finally, Ms. Mower apparently told her attorneys that she had signed some of the Resultz checks. (Id. at 43.)

Based on the record, it is clear to the court that Ms. Mower's attorneys' decision not to call the handwriting expert was sound trial strategy.

Other Witnesses

Ms. Mower contends that her attorney was ineffective by failing to "present critical evidence . . . regarding the back-dated loan document presented to the IRS, commission payments from Australia, the phone call from Leslie Mower regarding the commission checks in Australia, the Resultz account . . . ." (Mem. Supp. Mot. Vacate 10, 2:08-CV-00005-TC, Dkt. # 2.) Ms. Mower relies on the affidavit of Allen Davis to support her argument. (Mem. Supp.

Mot. Vacate, Ex. D.) But Ms. Mower really appears to be arguing, not that her attorneys should have called other witnesses, but that on cross-examination, Ms. Mower's attorneys should have asked Mr. Davis additional questions that would have exculpated Ms. Mower.

Mr. Davis testified at trial as a government witness under a grant of immunity. But after examination of Mr. Davis' testimony at trial and his affidavit filed in support of Ms. Mower's motion, the court concludes that in his cross-examination of Mr. Davis, Ms. Mower's attorney elicited testimony that was generally helpful to Ms. Mower, showing that Ms. Mower was relatively uninformed about the transactions that the government claimed were central to the tax evasion counts. (See Trial Tr. vol. 5, 652-54, Mar. 11, 2005, 2:02-CR-00787.) Nothing in the record supports Ms. Mower's arguments that her attorneys' decision to end their questioning of Mr. Davis when they did was ineffective assistance of counsel.

Settlement Offer

Ms. Mower claims that her attorneys did not present her with settlement agreements offered by the government. Her attorneys unequivocally testified that they presented all settlement agreements to her. The court found her attorneys very credible. Additionally, her attorneys had records evidencing that they presented all concrete plea offers to Ms. Mower.

Mr. Kaplan testified that before Ms. Mower was indicted, the government proposed that in exchange for Ms. Mower's testimony at trial, the government would recommend "no jail" time. (Hr'g Tr. 95.) Both Ms. Smith and Mr. Kaplan testified that when they presented the offer to her, Ms. Mower refused and, when they told her she faced the possibility of prison, "Mrs. Mower started crying . . . . And then . . . she said, 'I'll just write a book in prison.'" (Id. at 16- 22, 96.)

Following the return of the indictment, Ms. Mower's attorneys and the government

6

continued to talk about a possible plea agreement. Mr. Kaplan testified: "We had continuing discussions with Mrs. Mower up until probably almost the time of trial about that [the advantages of pleading guilty], but we understood and respected her decision that she did not want to plead guilty." (Id. at 18.) When the court asked him whether he had ever not presented a "concrete" offer to Ms. Mower, Mr. Kaplan replied emphatically, "Never." (Id.)

Ms. Smith testified that "[w]e would always communicate it [any plea offer from the government] to Mrs. Mower the next time we saw her. There were large periods of time when actually we had very little contact with her because of her international travel with her business. But we would communicate all offers the next time that, you know, we saw her. We usually did those in person." (Id. at 97.) When asked whether she had presented plea offers to Ms. Mower, Ms. Smith answered, "I have been a defense attorney for a really long time, and we always present plea offers to our clients because it's their choice." (Id. at 95.)

Ms. Mower's attorneys had various records and documents that supported their contention that they always presented plea offers to Ms. Mower. Mr. Kaplan testified that he presented the "no jail" offer to Ms. Mower on September 13, 2004. A billing record for Mr. Kaplan's and Ms. Smith's law firm, had the following entries:

> 09/13/2004 ARS   Travel to Provo; meeting with client, corporate counsel, B. Grazier; phone conference with R. Hyde.
> 09/13/2004 NAK    Office Conference with ARS; office conference with Leslie Mower et al; office conference with Bart Grassier; office conference with C. Crump; office conference with B. Murdock; review gross receipts documents.

(Hr'g Ex. 3.)

Mr. Kaplan explained that the record reflected a trip he and Ms. Smith made to Provo where they discussed a number of things with her, including the plea offer. (Hr'g Tr. 36.) In response to Ms. Mower's attorney's question why Exhibit 3 did not have more detail, such as

7

"discussed D.O.J. offer," Mr. Kaplan testified, "It's our practice Mr. Snuffer, and that of I think a number of other lawyers that practice criminal defense, we keep those matters–we make more generic descriptions." (Id. at 38.)

Ms. Smith produced notes that she had taken during the September 13 meeting with Ms. Mower. On the first page Ms. Smith had written "plea offer." (Hr'g Ex. 9, CS025.) She testified that the notation meant that she, Mr. Kaplan and Ms. Mower discussed the plea offer on that date (Hr'g Tr. 99.) She also testified that she was "quite certain" that she and Mr. Kaplan took the letter from the prosecutor outlining the terms of the plea offer (Hr'g Ex. 1) to Provo and showed it to Ms. Mower. (Hr'g Tr. 99-100.)

Based on all the facts in the record, the court concludes that Ms. Mower's attorneys presented all plea offers to her.

<u>Ms. Mower's Right to Testify</u>

Ms. Mower claims that her attorneys refused to let her testify. Both Ms. Smith and Mr. Kaplan testified that they strongly advised Ms. Mower not to testify, despite the fact that they "thought on many levels that she would make a very good witness." (Id. at 24.) Mr. Kaplan testified that he never told her that she could not testify and he "thought she always agreed with us that she shouldn't testify. There were a lot of unexplained things which we did not feel, you know, showed guilt, but that were fodder for cross-examination." (Id. at 26.)

Her attorneys' main concern was deposition testimony that Ms. Mower had given in an earlier civil suit. According to Mr. Kaplan and Ms. Smith, Ms. Mower had admitted to them that she had testified falsely at the deposition that she had not received income from an entity called M.P. Trust. Her attorneys knew that she had received the income and when they asked Ms. Mower why she had given that deposition testimony, "she said that she was prepared to testify

correctly, and that she was kicked under the table by her attorney, who was James Thompson [a co-defendant in the criminal trial]. And they took a recess, and he told her to lie because that was the only way they could win the case." (Id. at 25, 101-103.)[6]

Ms. Mower's attorneys filed a motion under Federal Rule of Criminal Procedure 404(b) seeking to have the evidence of Ms. Mower's false deposition testimony excluded. The trial court agreed but indicated that if Ms. Mower testified, this evidence could be used to impeach her. (Id. at 24-25.)[7]

What's more, the evidence does not support Ms. Mower's contention that her attorneys refused to let her testify. Ms. Mower testified at the hearing that when a government witness, Annette Jenkins, testified at the trial, Ms. Mower said to Mr. Kaplan, "Oh my gosh. Let me testify . . . . Put me on the stand, Neil. I really feel like I really need to get up there and let the jury know." (Hr'g Tr. 71.) According to Ms. Mower, Mr. Kaplan refused. At most, if true, Ms. Mower's statements seem to indicate that in the heat of trial, during the testimony of an important witness, Ms. Mower excitedly asked her attorneys to let her testify and they refused. To the court, this conversation, if it occurred, is not determinative, particularly in light of her attorneys' testimony on this issue. Mr. Kaplan denied that he did not allow Ms. Mower to testify. Instead, according to Mr. Kaplan, "Mrs. Mower followed our advice and agreed that she should not testify when we went over the pros and cons." (Id. at 38.) Ms. Smith testified that although

---

[6]Although at the hearing, Ms. Mower testified that her deposition testimony was not false, the testimony of Ms. Smith and Mr. Kaplan, and the notes Ms. Smith made when Ms. Mower recounted the incident when Mr. Thompson kicked her under the table, the court concludes that Ms. Mower's hearing testimony was not credible. (Hr'g Tr. 103-105, Ex. 9 at CS024.)

[7]In fact, the government listed this allegedly false deposition testimony as an over act in the indictment.

Ms. Mower "always wanted to testify" ( <u>Id.</u> at 105), neither she nor Mr. Kaplan ever refused to let Ms. Mower testify because: "That was always her decision, but we–our strong advice, because of this issue [the false deposition testimony] and the damage that we thought it would do in the context of that trial, was that she should not testify, but it was her decision."  (<u>Id.</u>)

      2. PREJUDICE

Even if Ms. Mower had shown that her attorneys' performance was not effective, which she hasn't, her motion would fail because she has not shown that she suffered prejudice as a result of any of her attorneys' claimed errors.  Looking at her argument that her attorneys should have called a handwriting expert, the record shows that there was sufficient evidence before the jury, even without the expert, that Ms. Mower did not sign the 1994 tax return.  And the question of whether she signed certain checks that were deposited in the Resultz account was not significant.

Similarly, nothing raised in the affidavits shows that the testimony that Mr. Davis would have given, if asked, seems relevant, particularly in view of Mr. Davis' clear bias in favor of Ms. Mower during his testimony. (The government was forced to impeach Mr. Davis several times throughout his testimony, even though he was called by the government.)   Looking at her claim that her attorneys failed to inform her of various government plea offers, Ms. Mower testified at the hearing that she would not have accepted any plea offers by the government that would require her to plead guilty and be a felon.  (<u>Id.</u> at 90.)  And finally, although Ms. Mower claims she wanted to testify, she has pointed to no specific facts that she needed to convey to the jury and, in light of the substantial impeachment evidence that the government possessed, it appears that her attorneys made a wise choice when they advised her not to testify.

10

For the above reasons, Ms. Mower's petition is DENIED.

SO ORDERED this 22nd day of August, 2008.

BY THE COURT:

TENA CAMPBELL
Chief Judge